## Blake v. Black Bear Coal Company.

(Decided December 13, 1911.)

### Appeal from Bell Circuit Court.

Contract—Reformation · of—Mistake—Recovery of Money.—In an action to reform a contract on the ground of mistake, and to recover money paid by mistake, evidence examined and held to sustain the finding of the chancellor denying the recovery.

METCALFE & JEFFRIES for appellant.

D. B. LOGAN for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

On May 15th, 1902, Vincent Boreing leased to his son-in-law, Dr. A. H. Melcon, about 500 acres of coal land lying on Four Mile Creek in Bell County, Kentucky. By the terms of the lease Melcon was given the right to mine, ship and sell coal from said property for a period of twenty-five years from the date of the lease. In consideration therefor he was to pay the lessor a royalty of eight and one-third cents per ton on all coal mined there.

The shipping point for the mines was Four Mile station, and this mine and the other mines on Four Mile Creek were reached by a branch or spur railroad built out from the main line of the Louisville & Nashville Railroad. By the terms of the lease from Boreing to Melcon it was provided that this branch line or railroad spur should be built by the Louisville & Nashville Railroad and paid for by the coal mining companies operating on Four Mile Creek, but that said coal mining companies, including the mine leased by Melcon, were to be repaid for building this spur or branch line by charging the cost of same up to Vincent Boreing and deducting the amount from royalties owing to Boreing under the lease, so that

in the end .said spur branch line would be paid for by Boreing instead of by the mine operators.

By the further terms of said lease it was provided that the side tracks necessary for use at the tipples and mine openings should be constructed· and paid for entirely by the lessee, Melcon, and his assigns.

On December 30th, 1902, A. H. Melcon, in consideration of the issual and delivery to him of twenty per cent. of the entire original.capital stock of the Black Bear Coal Company, and a like amount of any subsequent issue assigned and transferred, in. writing, all of his rights, interests and privileges under said lease to the Black Bear Coal Company, and the latter company, in consideration therefor, assumed and agreed to perform all the covenants and undertakings imposed upon Melcon as lessee.

On March 9th, 1903, the Black Bear Coal Company and the Louisville & Nashville Railroad Company entered into a contract for the construction of that part of the spur or branch railroad which the Black Bear Coal · Company, by agreeing to perform the obligations imposed upon Melcon by the Boreing-Melcon lease, was required to build, as well as the side tracks necessary for the conduct of the company's business in, mining coal. In consideration for the construction of these tracks the Black Bear Coal Company agreed to pay the Louisville & Nashville Railroad Company the cost thereof at the rate of not less than $250 per month. It also agreed to pay the railroad company in cash, semi-annually, a rental equal to six per cent interest on the value of the rails and splices, which value was fixed in the contract at.$29 per ton for the rails, and forty-five cents per joint for· splices. The coal company was given the privilege .of paying the railroad company in coal at the price prevailing in that district for similar coal at the time of delivery.

The Black Bear Coal Company operated the mine a few months. Its only officers and stockholders were L. A. Ault, president, W. H. Field, secretary and treasurer, and A. H. Melcon, general manager.

By contract dated November 30th, 1904, the Black Bear Coal Company leased to one Edward Blake the .mine referred to, together with all the rights and privileges vested in it by virtue of the Boreing-Melcon lease and the assignment thereof to the Black Bear Coal Company. Among the provisions of this contract are the following:

"In consideration of this lease and the rights and privileges herein granted and given by said company to said Blake, the said Blake hereby covenants and agrees with said company:

"(1) That during the entire term of said lease he will punctually make all the payments and keep and perform each and all of the obligations which, by the terms and conditions of said Boreing-Melcon contract, are to be paid, kept and performed by said A. H. Melcon and his assigns, and will hold and keep the said Melcon and his assigns and the said company harmless on account of their obligations, duties or responsibilities under said Boreing-Melcon contract.

"(2) That during the entire term of this lease he will punctually make all the payments and keep and perform each and all the obligations which, by the terms and conditions of said railroad contract, are to be paid, kept and performed by said company (lessor herein) and will hold and keep the said company harmless on account of its obligations, duties and responsibilities under said railroad contract."

It was further stipulated in said lease from the Black Bear Coal Company to Blake that the latter was to pay a rental of $250 each and every month during the continuance of the lease. Blake was further required to pay to the Louisville & Nashville Railroad Company $250 per month until the debt of that company for the construction of the spur and side tracks was fully liquidated. It was also stipulated that Blake was to pay all taxes, charges and assessments against the property. There was also a provision for the forfeiture of the lease in case Blake failed to comply with its provisions.

In the month of March, 1907, Charles W. Logan, who had been appointed receiver of the Boreing estate, took legal steps against the Black Bear Company, by motion and rule in the Bell Circuit Court, to require that company to pay to him, as receiver for the Boreing estate, certain sums of money which Blake had theretofore paid to the railroad company in payment of the construction charge for the side track. These sums, together with the interest thereon, amounted to $4,264.03. Subsequently, the contract of lease was rescinded by mutual consent.

Charging that the real agreement entered into between him and the Black Bear Coal Company was that the entire cost due the Louisville & Nashville Railroad Com-

pany for the construction of both the spur and side tracks should be charged to the Boreing estate and paid for out of royalties due it, and that by mutual mistake of law and fact the contract of lease entered into between him and the Black Bear Coal Company provided that he should perform the obligations of Melcon in the Boreing-Melcon lease to discharge the indebtedness due the railroad company for the side tracks on his own account, and that by virtue of said mistake he had paid to the Boreing estate, for the benefit of the Black Bear Coal Company, the sum of $4,264.03, Blake brought this action against the Black Bear Coal Company to have the contract of lease reformed so as to express the real intention of the parties, and to recover said sum and interest. The Black Bear Coal Company denied the allegations of the petition and also pleaded a counterclaim for certain sums. Upon final hearing the trial court dismissed Blake's petition, and sustained the defendant's counterclaim for $52.10, being the amount of taxes which the court held plaintiff was liable for under his contract of lease. From that judgment the plaintiff appeals.

As there is no complaint of that part of the judgment with reference to the $52.10, and as the Black Bear Coal Company has not appealed from that part of the judgment dismissing the remainder of the items constituting its counterclaim, it will not be necessary to discuss the propriety of the court's judgment in these respects. We shall, therefore, proceed to the discussion of the main point in controversy.

Blake claims that, when he first approached Melcon, the latter fixed the valuation of the mining property at $30,000, and agreed to dispose of it at that price, or to lease it to him on the basis of ten per cent. of that valuation, or $250 per month. He afterwards went to the county clerk's office and examined the Boreing-Melcon lease. He examined it for the purpose of ascertaining the amount of royalty to be paid. Through carelessness he did not examine the provisions with reference to Melcon's bearing the expense of constructing the side track, and was not aware of this provision. On November 12th, 1904, he received a letter from L. A. Ault, president of the Black Bear Coal Company, to the effect that they would turn the property over, free from all debt save a construction charge of $6,963.02 due the Louisville & Nashville Railroad Company, which sum,

however, was to be deducted from the royalties due the Boreing estate, and so constituted no charge at all against the property, the only charge being that of the royalty mentioned by Blake in his letter. Blake then went with Melcon to Cincinnati. In all his conversations with the officers of the Black Bear Coal Company it was understood that the construction charge of the railroad for both the spur and the side tracks was to be paid out of royalties due to the Boreing estate. While in Cincinnati he never saw a copy of the Boreing-Melcon lease, or the contract between the coal company and the railroad company. When he signed the contract finally entered into between him and the coal company, he did so before it was finished. The inventory which was to be made a part thereof, together with the Boreing-Melcon lease and the railroad contract, were not sent to him for several days after his contract with the coal company was signed. On cross-examination he stated that he signed the contract in question carelessly, without knowing that it contained provisions to the effect that he was to comply with all the obligations of Melcon in the Boreing-Melcon lease, and all the obligations assumed by the Black Bear Coal Company in its contract with the railroad. He was of the opinion that the officers of the company innocently misrepresented to him the effect of the Boreing-Melcon lease. At the time of the signing of the contract it was understood by the officers and agents of the Black Bear Coal Company and him, that every charge which was for the account of the construction of the main line and side tracks was to be paid by the Boreing estate. He raised the question after getting his copy of the contract, and the officers assured him personally that it was a mistake; that the railroad construction was to be charged to the account of royalty due the Boreing estate. Later on, all of said officers re-affirmed their belief that everything payable to the Louisville & Nashville Railroad Company for the construction of the railroad and side tracks was to be charged to the royalty account. He knew of the provisions of the Boreing-Melcon lease with reference to Melcon paying for the side track himself at the time he made the payments to Charles W. Logan, receiver. He made these payments because he was afraid the receiver would close him up, or that the Black Bear Coal Company, from whom he was negotiating a loan of

$2,000, would fail to furnish him the money; being "between the devil and the deed blue sea," he made the payments under compulsion.

The testimony for the Black Bear Coal Company is to the effect that the negotiations for the lease of the mine were first begun by Blake and Dr. Melcon. The contract agreed upon was that Blake was to stand in the shoes of the coal company and take the property subject to all the obligations imposed by the Boreing-Melcon lease and the railroad contract. A rough draft of a lease was made by D. B. Logan, of Pineville. Blake and Melcon took this with them to Cincinnati. The contract was drawn up by Ault's lawyer. The greater part of two days was consumed in its preparation. The contract was first written up and discussed, item by item. Several changes were made. Subsequently it was redrafted and signed by the parties as drawn, with the exception of two or three immaterial interlineations. During the whole of the proceedings the Boreing-Melcon lease and the railroad contract were before the parties, and carefully considered. The witnesses for appellee upon this point are L. A. Ault, president, W. H. Field, secretary and treasurer, A. H. Melcon, general manager, and W. F. Boyd, the attorney who drafted the lease in question.

Here, then, we have a case where a party, who seeks to avoid the consequences of a contract on the ground of mistake, admits that he read another contract, the obligations of which he assumed in the contract in question, but failed, through carelessness, to notice one of its important provisions. Besides this, the overwhelming weight of the evidence is to the effect that the Boreing-Melcon lease, as well as the railroad contract, were before the parties at the time of the execution of the lease between appellant and appellee. As he, in the lease in question, assumed the provisions of each one of these contracts, it was incumbent upon him to know their provisions. As was said in the case of Upton v. Tribilcock, 91 U. S., 45, 23 L. Ed., 203, and cited with approval by this court in J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky., 581, "It will not do for a man to enter into a contract, and when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted contracts would not be worth the paper on which they are written. But such is not the law. A contractor

must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission." A different rule prevails where the party is misled as to the nature of the writing and is not, himself, negligent. Western Mfg. Co. v. Cotton & Long, 126 Ky., 749. The evidence in this case fails to show that appellant was mislead. Being an intelligent and shrewd business man, and having been engaged the greater part of two days in the preparation of a satisfactory contract, it was certainly negligence on his part to sign the contract without knowing that it contained provisions to the effect that he assumed all the obligations of two other contracts and without knowing what those obligaions were.

Judgment affirmed.