## United Talking Machine Company v. Metcalf.

(Decided April 22, 1915.)

Appeal from Muhlenberg Circuit Court.

Contracts—Fraud—Evidence.—In an action to recover on a contract in the sale of certain talking machines, evidence examined and held insufficient to sustain a charge that defendant's signature to the contract was obtained by fraud.

C. A. DENNY for appellant.

WALKER WILKINS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

On January 23rd, 1913, John H. Metcalf ordered from the United Talking Machine Company 13 cartons of United 10-inch double records, each carton to contain 32 records, at the price of $20.80 per carton. The order was in writing, and further provided that the United Talking Machine Company was to ship with each carton of records one Symphony Hornless Talking Machine and 100 needles. The contract contained an additional order for 300 packages of needles at 3½c per package. The contract also provided that the additional 10-inch records without free machine were to cost 39 cents each and were to be retailed at not less than 65 cents. In consideration of this order Metcalf was to have the exclusive control of the Symphony Talking Machines and United Records. The contract contained another provision to the effect that the order covered and included all agreements between the United Talking Machine Company and Metcalf. A few days later the machines and records were delivered. Metcalf declined to receive them.

This action was brought by the United Talking Machine Company against Metcalf to cover the purchase price, amounting to $281.96. Metcalf defended on the ground that the contract was obtained by fraud. A trial before a jury resulted in a verdict and judgment for Metcalf. Plaintiff appeals.

Plaintiff's agent, who made the sale, testifies that he went to defendant's store on the day the contract was signed and remained there about two hours. He ex-

plained in detail the terms of the contract. After the terms had been fully discussed Mr. Metcalf signed the contract. At the same time he delivered to Metcalf a carbon copy. The records were selected by a young lady and young gentleman in the store. The contract he made with Metcalf was the only one that he had authority to make. He was not authorized to sell one machine only and then furnish Metcalf records as he might need them. He did not sell Metcalf only one machine or promise to do anything of that kind. The company would not have filled an order written that way. The sample machine was to be shipped by express. The twelve others were to follow by freight. Mr. Metcalf saw the contract before he signed it. While in the store he talked to Mr. Metcalf about representing the company as agent. After the contract was signed he remained in the room for about thirty minutes. He did not do or say anything to prevent Mr. Metcalf from inspecting the written contract or knowing its contents before he signed it. To the best of his knowledge and belief Mr. Metcalf thoroughly understood the transaction before he signed the contract.

Metcalf testified that the agent explained to him that all he had to buy was a sample machine with 32 records, which would cost $20.80. The purpose was to give away one machine with each $25.00 worth of goods sold. He and the company would make their money out of the records. The agent explained that he only had to invest $20.80. They talked on for an hour and a half or two hours. He finally agreed to handle it. After the agreement was made, the young lady and young gentleman in his store selected the records. While three or four customers were in the store and he was waiting on them the agent came to him and said here is a little thing I want you to sign just to show that you are our representative. He did not read the contract because he thought he was doing business with business people. He did not see the paper before he signed it. No carbon copy was delivered to him. The agent remained there a few minutes and then left. A few days later the machines came. The records were not the ones selected. He returned all of the machines and records to the company and wrote the company that a mistake had been made. Howard Coffman, a clerk in defendant's store, testified that he did not hear any of the conversation with refer-

ence to the purchase of the machine. The only thing that he heard was the agent's statement to Mr. Metcalf that he wanted the latter to sign the contract just to show he was the company's representative or agent in Central City. After signing the contract Mr. Gentry took it and he supposed Mr. Gentry put it in his pocket. A woman clerk in the employ of defendant testified that Mr. Metcalf agreed to act as agent for the talking machine company in Central City and around Central City. The agent was to send the sample machine and records until more were ordered. When the agent handed the contract to Mr. Metcalf he stated that it was just to show that Mr. Metcalf was the agent in town.

The court instructed the jury, in substance, to find for plaintiff unless they believed from the evidence that the signature of the defendant was procured by fraud by plaintiff's agent, which fraud, if any, prevented defendant from reading the contract before signing it.

It is the contention of the plaintiff that the testimony of defendant and his witnesses was insufficient to show fraud. It is a rule in this State that a party who can read and has an opportunity to read the contract which he signs must stand by the words of his contract, unless he is misled as to the nature of the writing which he signs or his signature is obtained by fraud. Western Mfg. Co. v. Cotton & Long, 126 Ky., 749; Blake v. Black Bear Coal Company, 145 Ky., 788; Case Mill Mfg. Co. v. Vickers, 147 Ky., 396; J. I. Case Threshing Machine Co. v. Mattingly, 142 Ky., 583. To sustain the charge that a party's signature was obtained by misrepresentation, it must appear that the misrepresentation was material; that it was relied upon by the person whose action was intended to be influenced and that it was made with knowledge of its falsity, or under circumstances which did not justify belief in its truth. The Chicago Building & Mfg. Co. v. Beaven, 149 Ky., 267. We give below the precise language of defendant, detailing the circumstances under which the contract was signed:

"Q. When you signed this paper purporting to be a contract, what were you doing? A. About that time three or four customers came in and Mr. Gentry called me back and says, 'Here is one other little thing I want you to sign just to show that you are our representative.' Q. Did you know at that time that you were ordering thirteen sets of records and machines? A. I didn't read

it.  Q. Why did'nt you read it?  A. I thought I was doing business with business people; I thought Mr. Gentry was an honest man.  Q. What were you doing?  A. I was busy, customers coming in.  Q. How long had he been there then?  A. About two hours.  Q. How long after you signed this paper until he left?  A. Just a few minutes.  Q. Were you still busy when he left?  A. Yes, sir.  Q. Had you seen the paper before you signed it?  A. No, sir.  Q. When you signed this did you sign it over carbon?  A. Not that I know of.  Q. Did he leave a carbon copy of this paper with you?  A. No, sir.''

Here then we have a case where plaintiff's agent and defendant, an active, alert business man, were engaged for about two hours in discussing the terms of the contract which the defendant subsequently signed.  It is not claimed that the agent incorrectly read the contract in question.  The agent did not say that the contract was an order for only one carton.  Defendant's whole case is based on the agent's statement to the effect that "here is one other little thing I want you to sign just to show that you are our representative," and that he did not read the contract because he thought he was doing business with business people and that the agent was an honest man.  When asked why he did not read the contract, his reply is: "I thought I was doing business with business people; I thought Mr. Gentry was an honest man."  The contract did provide that defendant was to be the local agent.  Nowhere does defendant say that he failed to read the contract because of the alleged statement of the agent.  Nowhere does he say that he relied upon any representation of the agent as to the effect of the contract.  His sole excuse is that he thought he was doing business with business people and that the agent was an honest man.  In failing to show that he relied upon the alleged misrepresentation of the agent and was thereby prevented from reading the contract before he signed it, he did not sustain the defense that his signature to the contract was obtained by fraud.  We, therefore, conclude that the trial court erred in submitting the issue of fraud to the jury.

Judgment reversed and cause remanded for a new trial consistent with this opinion.